# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 8100 | **DATE** | 8/10/2004 |
| **CASE TITLE** | Panduit Corporation vs. Hellermanntyton Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: The Court holds that the PTO's reexamination of Panduit's 732 Patent will not affect HellermannTyton's liability for breach of contract of the settlement agreement. Therefore, Defendant's renewed motion for stay of the breach of contract claim is DENIED.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | AUG 11 2004 | |
| | Notified counsel by telephone. | | date docketed | 51 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | | |
| | Copy to judge/magistrate judge. | CLERK | | |
| WAP | courtroom deputy's initials | 2004 AUG 11 AM 8:26  Date/time received in central Clerk's Office | date mailed notice  mailing deputy initials | |

FILED
AUG 10 2004

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

DOCKETED
AUG 11 2004

PANDUIT CORPORATION,

    Plaintiff,

v.

HELLERMANNTYTON CORPORATION,

    Defendant.

Case No. No. 03 C 8100

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Plaintiff Panduit Corporation (hereinafter, "Panduit") first brought a patent infringement action against Defendant HellermannTyton Corporation (hereinafter, "HellermannTyton") in 2001, which was dismissed without prejudice after the parties entered into a settlement agreement in which HellermannTyton agreed to refrain from infringing Panduit's U.S. Patent No. 5,998,732 (the "Patent 732"). Panduit now brings a breach of contract and patent infringement claim against HellermannTyton, alleging that HellermannTyton violated the settlement agreement by infringing on Patent 732. HellermannTyton successfully filed a motion to stay Panduit's patent infringement claim pending the outcome of the reexamination of Patent 732 by the United States Patent and Trademark Office (the "PTO"). HellermannTyton now files this motion contending that a stay of litigation on the breach of contract claim is also necessary pending the outcome of the PTO's reexamination of Patent 732.

## I. BACKGROUND

On November 7, 2001, Panduit and HellermannTyton entered into a settlement agreement resolving a prior patent infringement lawsuit initiated by Panduit. The agreement defined the patent in question and the products covered by the patent as follows:

1.  Definitions:

    (a) "Panduit Patent" shall mean U.S. Patent No. 5,998,732.

    (b) Subject Products shall mean (i) the HellermannTyton Multi-Channel Raceway Side Electric Box (HellermannTyton Part No. MCR-SEB) and (ii) all products, existing now or in the future, covered by any claim of the Panduit Patent.

As part of the agreement, Panduit waived its claim for damages for infringement prior to the date of the settlement, and also allowed HellermannTyton to dispose of its existing inventory. In return, HellermannTyton agreed to cease making and selling products "covered by any claim" of Patent 732. Following the settlement, HellermannTyton began producing the at-issue product, which caused Panduit to file the present suit. Panduit claims that the at-issue product amounts to only a slightly modified design of the original Raceway Side Electric Box, and that the two products are identical in all material ways. Accordingly, Panduit believes that the 2001 settlement agreement bars HellermannTyton from manufacturing the at-issue product.

While the present suit was ongoing, the PTO decided to reexamine Panduit's Patent 732. This led HellermannTyton to request a stay of litigation during a January 22, 2004 status conference, which the Court denied. On February 13, 2004, HellermannTyton renewed its stay motion in written form. On February 19, 2004, the Court granted HellermannTyton's motion to stay the patent infringement claim, but refused to stay the breach of contract claim. HellermannTyton then filed the present motion, again seeking to stay of the breach of contract claim.

## II. DISCUSSION

### A. Does the Lear Doctrine Prevent Enforcement of the Settlement Agreement?

HellermannTyton argues that the issues of breach of contract and patent infringement in this litigation are intertwined. As a result, HellermanTyton believes that the Court should stay the present litigation in its entirety until the PTO finishes its reexamination of Patent 732. For support, HellermannTyton relies on the federal patent policy enunciated in Lear, Inc. v. Adkins, 395 U.S. 653 (1969).

In Lear, the Supreme Court held a patent license that required the payment of royalties unenforceable following a later determination that the subject patent was invalid. The Lear court stressed that a patent licensee could challenge the validity of the licensed patent because "the important public interest in

permitting full and free competition in the use of ideas which are in reality a part of the public domain." Id. at 674.

Here, HellermannTyton argues that the settlement agreement prohibits only the infringement of Patent 732. Since it is impossible to infringe an invalid patent, HellermannTyton contends that even the breach of contract issue cannot be adjudicated until after the PTO concludes its reexamination. Otherwise, Hellermann-Tyton believes that the Court could run the risk of improperly holding that it is infringing an invalid patent. In so doing, HellermannTyton claims that the Court would run afoul of the federal patent policy outlined in Lear.

Panduit correctly counters that HellermannTyton's reliance on Lear is misplaced. As Panduit notes, subsequent case law clearly establishes that the Lear doctrine applies only to patent licenses, and not to agreements settling patent infringement litigation. See Hemstreet v. Spiegel, Inc., 851 F.2d 348, 350 (Fed. Cir. 1988). This is because, while the Lear doctrine supports legitimate public policy concerns, those interests must be balanced by the "compelling public interest and policy in upholding and enforcing settlement agreements voluntarily entered into," which fosters judicial economy. Id.

There is no dispute that the present litigation involves a settlement agreement of previous litigation, and not a mere patent

license. Therefore, Lear does not form a per se bar to Panduit's contractual litigation efforts.

### B. Does the Settlement Agreement Preclude HellermannTyton from Challenging the Validity of Patent 732?

HellermannTyton next argues that, in the event the Court finds that Lear does not create a per se bar, the settlement agreement exception to the Lear doctrine is limited. For support, HellermannTyton cites Flex-Foot, Inc. v. CRP, Inc., 238 F.3d 1362, 1370 (Fed. Cir. 2001). In Flex-Foot the Federal Circuit held that:

> . . . [o]nce an accused infringer has challenged patent validity, has had an opportunity to conduct discovery on validity issues, and has elected to voluntarily dismiss the litigation with prejudice under a settlement agreement containing a clear and unambiguous undertaking not to challenge validity and/or enforceability of the patent-in-suit, the accused infringer is contractually estopped from raising any such challenge in any subsequent proceeding. Id.

According to HellermannTyton, the factors in Flex-Foot serve as conditions that a settlement agreement must have to escape the scope of the Lear doctrine. Here, HellermannTyton notes that each of the Flex-Foot factors is absent: it never challenged patent validity in the prior litigation, never conducted discovery on the validity issue, agreed only to a dismissal without prejudice, and never agreed not to challenge validity or enforceability in future litigation. As a result, HellermanTyton contends that the specific

settlement agreement at-issue in this case remains subject to the general principles of the Lear doctrine.

The Court believes that HellermannTyton's reliance on the so-called FlexFoot factors is likewise misplaced. In Flex-Foot, the Federal Circuit did not list the above factors to serve as a "test" for use in future litigation. Rather, the Federal Circuit merely recited the specific terms of the relevant settlement agreement at-issue in that particular case in holding that the accused infringer was contractually estopped from raising a challenge to the validity of the patent in subsequent litigation.

Indeed, as Panduit points out, courts have held that a settlement agreement bars future litigation over validity even when some or all of the Flex-Foot factors were absent. For example, in Ransburg Electro-Coating Corp. v. Spiller & Spiller, Inc., 489 F.2d 974 (7th Cir. 1973), a case cited with approval by Hempstreet and never questioned by any court, the Seventh Circuit held that a settlement agreement barred a manufacturer from producing products that infringed a since-held invalid patent. The Ransburg settlement agreement contained only two clauses: the payment of a specific-sum for past infringement, and a license agreement. Id. at 976. Nevertheless, despite lacking all of the Flex-Foot factors, this settlement agreement remained enforceable - thereby imposing a contractual bar to "infringing" an invalid patent. One finds at least one other similar skeletal agreement enforced by a

federal court in recent years. See Versa Corp. v. Bag International Ltd., 297 F.Supp. 2d 1206 (D.Neb. 2004). In contrast, HellermannTyton provides not a single case in which a court found that a settlement agreement did not bar subsequent litigation over validity, and the Court's own research found none.

Here, the at-issue settlement agreement may be a bare-bones arrangement, but it remains an enforceable one. As noted above, nowhere in the literal text of the agreement does HellermannTyton concede the validity of Patent 732, foreclose its right to challenge the validity of Patent 732 in the future, or admit that the Subject Products infringe Patent 732. Nevertheless, the agreement stipulates that HellermannTyton must cease "for the life of the Panduit Patent . . . making, using, selling, offering for sale, importing, distributing, promoting, contracting, displaying and/or advertising for sale the Subject Products." In carefully chosen language, the agreement defined the "Subject Products" as any item "covered by any claim of the Panduit Patent." In so doing, HellermannTyton contractually agreed – in exchange for valuable consideration – not to produce products "covered" by Patent 732, implicitly regardless of whether Patent 732 or its included claims are valid or invalid. Therefore, for any of HellermannTyton's conduct to date, it is irrelevant whether or not the PTO modifies Patent 732. Patent 732 remains alive, and,

therefore, HellermannTyton may not produce products "covered" by its claims.

The case law seems uniform that once a party elects to settle a case instead of litigating the issues of infringement and validity, it must keep its word. Interspiro USA, Inc. v. Pharos Protection USA, Inc., 18 F.3d 927 ("in signing the settlement agreement, [infringer] waived its right to challenge the validity and enforceability of the patent with respect to issues arising under the settlement agreement"); Flex-Foot, 238 F.3d at 1370 ("Settlement agreements must be enforced if they are to remain effective as a means for resolving legal disagreements. Upholding the terms of settlement agreements encourages patent owners to agree to settlements and promotes judicial economy."). Here, HellermannTyton agreed to a settlement agreement in exchange for valuable consideration. The Court sees no reason to permit it to violate its agreement. The Court therefore denies Hellermann-Tyton's motion to stay litigation pending the outcome of the PTO's decision.

### C. What is the "life of the patent?"

Although the PTO's decision is irrelevant for purposes of liability, its decision, if reached before conclusion of this litigation, could possibly impact damages assessed based on interpretation of the phrase "life of the patent." The Court therefore believes it necessary to define this specific term.

Under the interpretation of HellermannTyton, which this Court has rejected, if the PTO cancels or significantly alters Patent 732, then Patent 732 was never "alive" and HellermannTyton is not liable for damages for periods prior to the date that the reexamination certificate issues. Panduit offers this court an equally extreme interpretation – asking this Court to read "life of the patent" to mean its natural life, regardless of any subsequent decision concerning invalidity.

The Court prefers to define "life of the patent" according to its own interpretation, which it believes reflects a common sense, middle-ground approach. Essentially, the Court reads "life of the patent" to mean exactly that – until the date in which the patent ceases to have legal force. This could mean its natural expiry date, or it could mean the date in which a court or the PTO holds it partially or totally invalid. In the event of the latter, HellermannTyton (if found liable) would be subject to damages for breach of contract from the date of the settlement agreement until the date of a declaration of invalidity. Similarly, if the PTO or a court declares some claims of Patent 732 invalid, than HellermannTyton would remain liable with respect to any products "covered by any" remaining valid claim of the patent.

If this litigation concludes prior to the PTO's reexamination, and the trier of fact finds liability, the Court will assess damages through that date, and issue and injunction against further

breach of contract. Conversely, if the PTO concludes its reexamination before such a hypothetical finding of liability, and it modifies or annuls Patent 732 such that the at-issue product no longer constitutes a "Subject Product," then the Court will assess damages only until the date on which that decision is reached.

### III. CONCLUSION

For all the forgoing reasons, the Court holds that the PTO's reexamination of Panduit's 732 Patent will not affect HellermannTyton's liability for breach of contract of the settlement agreement. Therefore, Defendant's renewed motion for stay of the breach of contract claim is **DENIED**.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: August 10, 2004